IN THE
UNITED STATES DISTRICT COURT
FOR THE
EASTERN DISTRICT OF VIRGINIA
*Alexandria Division*

-------------------------------------------------------------x
                                     :

**CATHERINE M. BRENTZEL**,         :
Individually and as Personal Representative  :
of Robert C. Hacker, Deceased,     :
              :
      -and-       :   Civil Action No.:
              :

**ESTATE OF ROBERT C. HACKER**,   :
              :
            Plaintiffs,  :
              :
     -against-    :
              :

**AIG PROPERTY CASUALTY COMPANY**  :
   175 Water Street, 15th Floor    :
   New York, NY 10038     :
   Serve: Corporation Service Company  :
     100 Shockoe Slip, 2nd Floor   :
     Richmond, Virginia 22319-4100  :
              :
           Defendant.  :
              :
-------------------------------------------------------------x

## <u>COMPLAINT</u>

NOW COME Plaintiffs CATHERINE M. BRENTZEL and ESTATE OF ROBERT C.

HACKER, and for their complaint against the defendant herein, state as follows:

1. This civil action is instituted to recover damages and further relief from the defendant,

upon claims for breach of contract by repudiation and failure to indemnify insured losses by an

insurance company, and bad faith by an insurance company in investigating and denying claims

for casualty losses.

**THE PARTIES**

2.  Plaintiff Catherine M. Brentzel (hereinafter "Brentzel") is an individual who is a citizen of the United States and a resident and domiciliary of the Commonwealth of Virginia, and therefore a citizen of Virginia.

3.  Brentzel sues in both her individual capacity and as personal representative of the co-plaintiff Estate of Robert C. Hacker, deceased.  Letters of Administration were granted to Brentzel, as personal representative, on December 17, 2018, by the Superior Court of the District of Columbia, Probate Division.  This administration (No. 2018 ADM 001430) is not subject to continuing supervision of that Court, and the powers of Brentzel as personal representative are not limited.  Pursuant to 28 U.S.C. § 1332(c)(2), in her capacity as legal representative of the Estate of Robert C. Hacker, Brentzel is deemed to be a citizen only of the same State as the decedent.

4.  Plaintiff Estate of Robert C. Hacker, deceased, is the successor in interest to Robert C. Hacker, an individual who was a citizen of the United States and a resident and domiciliary of the District of Columbia, and therefore a citizen of the District of Columbia, as of the time of his death on November 9, 2018.  The will of Robert C. Hacker was accepted to probate in the Superior Court of the District of Columbia, Probate Division, on December 17, 2018, and that order was the basis for the letters of administration of even date issued to plaintiff Brentzel.  Hereinafter, Hacker and/or his Estate, or both jointly, are referred to as "Hacker."

5.  Accordingly, plaintiff Brentzel is a citizen of Virginia, and plaintiff Hacker is a citizen of the District of Columbia, which is treated as a State under 28 U.S.C. § 1332(a), pursuant to subdivision (e) of that statute.

6.  Defendant AIG Property Casualty Company (hereinafter "AIGPCC") is a corporation

incorporated in the State of Pennsylvania, and has its principal place of business in New York, New York.  AIGPCC is an indirect, wholly owned subsidiary of the American International Group, Inc. (hereinafter referred to as "AIG Parent"), which is a corporation incorporated in the State of Delaware, and has its principal place of business in New York, New York.  In between AIG Parent and AIGPCC is AIG Property Casualty U.S., Inc.  (hereinafter referred to as "AIG Property US"), incorporated in Delaware.   AIGPCC is only one of 31 separate subsidiaries of AIG Property US.  AIGPCC itself operates as part of a group of companies sharing offices, and referred to by AIG Parent as the "Private Client Group," which is described by AIG Parent as a group of insurance carriers "in the U.S. that covers auto, homeowners, umbrella, yacht, fine art, and collections," AIG Parent, 10-K Report for 2019, page 74, and markets those insurance products "in selected markets and [provides] insurance for high net worth individuals," *id.*

7.  AIGPCC represents such a tiny portion of AIG Parent's business that neither AIGPCC nor its direct parent company, AIG Property US, have their financial results dis-aggregated in the AIG Parent's annual report.  However, both are part of a business segment that AIG Parent calls North America-General Insurance.  Over the past three reporting years, 2017-19, AIG Parent has reported that its North America-General Insurance operations have posted underwriting losses totaling approximately $5.9 billion.  (AIG Parent 10-K Report for 2019, page 78).  These losses were partially but not wholly offset by investment income in 2017 and 2018; and were wholly offset in 2019.  However, AIG Parent admits that its "North America General Insurance business is focused on making progress towards improved underwriting results and efficiencies."  (*Id.*)

8.  Overall, the AIG Parent's business is global in scope, covering the entire United States, Canada, and approximately 80 foreign countries, and involves a wide variety of insurance and investment business lines.  AIG Parent has been in operation since 1919, and once was one

of the best insurance firms on earth. However, AIG Parent fell on hard times because of its central role in the global financial meltdown of 2008-2009, when it was advanced huge sums of money from the U.S. Treasury in order to keep it, and the financial industry in general, afloat. Even though over 10 years now have passed, AIG Parent continues to struggle financially. According to its own SEC filing for 2019, AIG Parent's overall financial performance has been highly erratic over the past three years: on a consolidated basis, and with a total revenue averaging approximately $50 billion per year, AIG Parent posted a loss of over $6 billion in 2017, a much smaller loss of $6 million in 2018, and a gain of some $3.3 billion in 2019, for a net result of approximately $2.76 billion in losses over the past three reporting years.

**FEDERAL SUBJECT MATTER JURISDICTION**

9. Plaintiffs invoke this Court's jurisdiction under 28 U.S.C. § 1332(a)(1).

10. Plaintiff Brentzel is a citizen of Virginia. Plaintiff Hacker is a citizen of the District of Columbia.

11. Defendant AIGPCC is a citizen of both Pennsylvania and New York.

12. Neither plaintiff is a citizen of the same State as the defendant. Therefore, this action satisfies the criterion of complete diversity of citizenship, and thus is between "citizens of different States," 28 U.S.C. § 1332(a)(1).

13. The matter in controversy in this action exceeds the sum or value of $75,000, exclusive of interest and costs, because (a) each plaintiff has a claim or claims against the defendant exceeding that jurisdictional amount, or (b) in the alternative, one of the plaintiffs has a claim against the defendant exceeding that jurisdiction amount, and all other claims in this action are part of the same case or controversy under Article III of the Constitution. Under either

or both grounds, this action satisfies the amount in controversy criterion under 28 U.S.C. §
1332(a), and/or 28 U.S.C. § 1367.

14.  Accordingly, this Court has jurisdiction of this action under 28 U.S.C. § 1332(a).

## BACKGROUND FACTS

15.  At all times relevant to this action, and during Hacker's lifetime, plaintiff Hacker and
plaintiff Brentzel were cohabiting as husband and wife.

### *The Insurance Contract Relationship Between AIGPCC and the Plaintiffs*

16.  For several years preceding the events involved in this action, plaintiff Brentzel and
her husband Hacker entered into contracts of insurance with defendant AIGPCC, obtained
through their insurance broker AON Private Risk Management, covering their real and personal
properties.

17.  As of mid-2015, this portfolio of insurance included four policies covering their
residences and personal property in the D.C.-Northern Virginia area.  One policy each covered
their three residences and the contents thereof, which included two owned residences located in
the District of Columbia and one rented residence located in Virginia.  The policies on the
District of Columbia residences were issued in the names of both Brentzel and Hacker.  The
policy on the Virginia residence was issued in the name of Brentzel, but also included her spouse
Hacker as an additional insured.  The fourth policy, issued in the names of both plaintiffs jointly,
was a valuables policy that provided special supplementary coverage for items of valuable
personal property, including jewelry, fine arts, and furs, wherever located.   All of the residential
policies also provided coverage for loss, theft, or damage to personal property ("contents"),

whether or not that property was located at the insured residence at the time of loss.  Personal property loss was covered at full replacement cost.

18.  As of mid-2015, the plaintiffs' policies issued by defendant AIGPCC were in transition to a new contract year, which began on July 9, 2015 and extended to July 9, 2016.  The policies in force during that 2015-16 contract year were essentially the same as the previous policies in force during the 2014-15 contract year, except for adjustments in the coverage limits and premiums paid by the plaintiffs.

19.  The residential policies in force in both 2014-15 and 2015-16 were occurrence-based policies, which means that the full coverage limit was available for multiple occurrences during a single contract year.  The valuables policies in force during those times were per-item policies, prescribing a per-item limit, plus an overall insured amount, for each class of valuables, which were jewelry, fine arts, and furs.  Like the residential policies, these policies were occurrence-based policies.

20.  As of the 2015-16 contract year, the personal property coverage limits and premiums paid by the plaintiffs for the residential policies were as follows:

|  | Personal property coverage | Premium Paid |
| --- | --- | --- |
| Policy on Virginia residence (rental): (#0032173198) | $ 1,168,544. | $  2,235. |
| Policy on 1607 28th St., NW (DC): (0003953824) | $ 3,333,853. | $ 14,405. |
| Policy on 3417 Prospect St,, NW (DC): (#0003953823) | $   962,881. | $  4,455. |
| Sub-Totals: | $ 5,465,278. | $ 21,095. |

The three residential policies had deductibles ranging from $10,000 to $25,000 per occurrence. However, all three of these policies had an amendatory rider providing for the waiver of the deductible in the event of "a covered loss of more than $50,000."

21.  To supplement the foregoing, the valuables policy (Policy No. PCG 0006019528) carried an additional coverage of $360,000 ($100,000 for jewelry, $250,000 for fine arts, and $10,000 for furs), for which the plaintiffs paid an additional premium of $1,790.00.  This policy covered "direct physical loss or damage to valuable articles anywhere in the world" (Policy Section II, ¶ A), and it had no deductibles.  Thus, in total, the plaintiffs had purchased approximately $5.835 million in personal property casualty insurance, plus liability coverage ($ 1 million), for which they paid approximately $23,000 in premiums annually.  In addition to these policies, plaintiffs also had three automobile policies and a $ 20 million umbrella (excess liability) policy with AIGPCC, for which the plaintiffs paid another $13,656 in annual premiums, and a kidnap/ransom policy with another AIG Parent affiliate, for an additional $9,158 annual premium.  All told, the plaintiffs were paying over $45,000 per year to AIGPC or its affiliate, for property, liability, and kidnap/ransom insurance, and over $36,000 per year for property and liability insurance alone.  These prices were at the high end of premiums charged per dollar of coverage in the Northern Virginia-D.C. area.

22.  All premiums were timely and fully paid to AIGPCC. As subsequent events were to prove, the plaintiffs got nothing in exchange for their premiums.

### *Events Leading to the Losses Covered by the Insurance Contracts*

23.  In or about June 2015, the plaintiffs contracted with Fairfax Transfer & Storage, Inc. (hereinafter "Fairfax Transfer"), to move their household goods from their Virginia residence to

their 28th Street residence in DC.  This move involved essentially the entire contents of the

Virginia residence.

24.  Fairfax Transfer is a corporation incorporated in the Commonwealth of Virginia

(Virginia State Corporation Commission entity id. no. 01899103), and has its principal place of

business in Lorton, Virginia.  Fairfax Transfer is engaged in the businesses of motor carriage of

property (Virginia Department of Motor Vehicles license number 1326) and interstate motor

carriage of household goods. (United States Department of Transportation certificate #836570).

25.  During this move, which was supervised by plaintiffs' household staff and occurred

in or about June22-24, 2015, with Fairfax Transfer both packing and moving the goods.

However, plaintiffs subsequently learned that all or a portion of the goods from the Virginia

residence was not delivered directly to DC, contrary to their orders, but instead was placed in

transit storage in the possession of Fairfax Transfer.  Circumstances later uncovered indicate that

at least some, if not most, of the insured losses occurred during the time when the plaintiffs'

property was in the possession of Fairfax Transfer, as a bailee/common carrier.

26.  Upon her return to her DC residence from out-of-town travel, in or about late June or

early July of 2015, Brentzel learned that the move had not been completed, and, even as to the

portion of the household goods delivered, they were in disarray and appeared to be damaged in

the course of the move.

27.  Additional deliveries were made on a piecemeal basis, extending from July 21, 2015

to the end of that year.  Only after the last delivery was made could a complete inventory be

compiled, and so the full extent of the insured losses could not be determined until in or about

January 2016.

28.  After advising Fairfax Transfer of the unsatisfactory state of their performance,

Brentzel notified AIGPCC of a potential claim for damage, on or about July 24, 2015.

29.  In fact, the household goods involved in the move from Virginia had been delivered to several different locations, including the intended destination at 28th Street in DC, the transit storage in Virginia, and, it was believed, the insured property at 3417 Prospect Street in DC.

30.  Over the next several months beginning from late July 2015, investigation and inventories taken by plaintiff Brentzel revealed that, in addition to damage, a significant portion of the household goods involved in the move had been lost or stolen.  When this fact was discovered, AIGPCC was notified promptly.

31.  In or about August 2015, a household staff member involved in supervising the move, Mr. David Lamonde, suddenly disappeared.  Subsequent investigation gave indications that Lamonde may have been involved in thefts of the goods being moved.  In the process of investigating his disappearance, it developed that Lamonde was wanted on criminal charges, including fraud, in several states.  Lamonde was apprehended and arrested in Pennsylvania in January 2016, and later convicted there on apparently unrelated charges of fraud or theft, and incarcerated.

32.  In or about September 2015, the plaintiffs suffered another insured occurrence at their 28th Street residence in DC, when $ 10,000 in cash and a $75,000 diamond ring–neither of which had ever been at the Virginia residence--were found missing, after a recent partial delivery of goods out of the transit storage by employees of Fairfax Transfer.  The episode was reported to the DC police authorities on or about September 23, 2015.  An employee of Fairfax Transfer ultimately was charged and convicted of this theft.

33.  Subsequently, it was learned that some of the goods missing from the Virginia house contents had been diverted into the black market in stolen goods, when they showed up for sale

in a consignment shop.  This too was reported to police authorities.

34.  By in or about January 2016, it had become clear that large portions of plaintiff's household goods had been lost or stolen during and after the move, and that multiple insured occurrences had taken place.  AIGPCC was so notified.

## CHARGING ALLEGATIONS

### The Desultory "Investigation" by AIGPCC

35.  In or about January 2016, defendant AIGPCC began what it claimed to be an investigation and adjustment of plaintiffs' insurance claims for loss, theft, and damage to their household goods through multiple insured occurrences taking place between June 2015 and January 2016, and covered under several different policies.  AIGPCC assigned its file claim number 558907 to these claims.

36.  Very little progress was made by defendant AIGPCC on its purported investigation until in or about September 2016.

37.  In the meantime, plaintiff Brentzel was conducting her own investigation and inventory of missing and damaged goods.  That investigation revealed that one or more occurrences of theft accounted for some of the losses, and that one or more employees of defendant Fairfax Transfer were involved in the thefts, which included the theft from plaintiffs' 28th Street DC residence of cash and jewelry, as set forth above.  During this period also, Lamonde was located and arrested in Pennsylvania on unrelated criminal charges.  So far as plaintiffs now are aware, Lamonde either remains incarcerated, or is a fugitive from justice.

38.  On September 16, 2016, representatives of AIGPCC were granted access to plaintiffs' DC residence for an inspection AIGPCC had requested, and those representatives met

personally with plaintiff Brentzel to discuss the plaintiff's insurance claims and the underlying circumstances thereof.

39.   On or about September 30, 2016, a certified letter, signed by Michael V. Tress on behalf of AIGPCC and/or AIG Parent, was dispatched to plaintiff Brentzel in DC from the offices of AIG Parent's "Private Client Group" in Berkeley Heights, New Jersey.  That letter purported to be following up on the inspection/meeting of September 16th; and included a long list of requests for further information.

40.   However, the tone of the September 30 letter was not merely one of inquiry, but also was dripping with innuendo apparently intended to accuse Ms. Brentzel of some sort of wrongdoing or dishonesty.  From that time forward, to and including the denial letter issued in September 2019, the tone and tenor of AIGPCC's activities and statements was accusatory and abusive toward its own insureds, including plaintiff Brentzel.

41.   Plaintiff Brentzel responded in full to the September 30 letter's requests for further information.  However, no matter how much information was provided over the ensuing months and years, it was never enough to satisfy AIGPCC, which always had more, and ever more trivial, requests for information that it did not need, and no reasonable person would believe to be needed, to adjust and pay the plaintiffs' insurance claim.  As this pattern of behavior unfolded, plaintiff Brentzel engaged counsel, H. Robert Yates of the O'Hagan Meyer law firm, in or about November 2016, to assist her in meeting AIGPCC's ever-escalating demands for information, which never ceased.

42.   The particulars of plaintiff Brentzel's efforts to provide information to AIGPCC during this time frame are as follows:

(a) On or about October 28 and 30, 2016, plaintiff Brentzel provided AIG with a 5-page

11

written narrative of the underlying events, in direct response to questions posed by AIGPCC in the September 30 letter, accompanied by a 7-page detailed inventory list, itemized by store, of the original purchase prices of the lost, stolen, or damaged items, and, where available, receipts for the amounts paid, totaling some $1.9 million.

(b) On or about November 22, 2016, Mr. Yates, on behalf of plaintiff Brentzel, sent a 9-page letter to Mr. Tress (who had signed the September 30 letter on behalf of AIGPCC) at the Berkeley Heights, New Jersey address of the AIG Parent's "Private Client Group." This letter reiterated the information previously provided by plaintiff Brentzel, and added further information, in a minutely detailed response to Mr. Tress's previous demands for information, on a demand-by-demand basis, and attaching further documents consisting of approximately 125 pages itemizing the missing items and their purchase prices, thus indicating the replacement cost valuation of the lost or stolen property.

(c) On December 27, 2016, Yates sent an email to Tress, asking about the status of the matter. Tress replied on December 28 that "[w]e are reviewing the received documentation with management."

43. On December 29, 2016, Yates filed, on behalf of both plaintiffs, a complaint for declaratory relief against AIGPCC. It may be inferred from this event that Yates already had begun to question AIGPCC's good faith in actually processing plaintiff's insurance claim, as opposed to first delaying and then ultimately denying the claim. Process was never served in that action, and a voluntary non-suit was taken in November 2017. The apparent objective of this filing– to bring AIGPCC into line with a proper claim-processing approach–was never accomplished.

44. Yates's concerns were soon confirmed by the receipt of a letter dated February 21,

2017, from a Mr. Jeffrey E. McFadden in the Washington, D.C. office of the Philadelphia law firm of Stradley Ronan Stevens and Young LLP., which had been engaged by AIGPCC to "represent AIG in connection with the investigation of the above-referenced claim " (letter, page 1), referring to the AIG "Private Client Group" claim number file number of 558907.  While Yates was not informed of this engagement by Tress until February 1, 2017, it is a fair inference that the engagement was made long before that date–perhaps even before Yates's inquiry of December 27, or even earlier than that:

(a) McFadden's letter of February 21 claims that his firm had "spent a substantial amount of time and effort reviewing the facts related to the claim, including a number of interviews of persons with knowledge of the claim and the facts underlying it, review of voluminous  documents, careful analysis and comparison  of the various summaries  your client, Ms. Brentzel, provided to AIG." (*Id*.).

(b) It is obvious on the face of this letter that it signifies a further escalation in the abusive behavior by AIGPCC and its agents and attorneys.  McFadden's letter claims that there are "discrepancies" within the claim, and threatens, in no uncertain terms, a denial of all or part of the claim: "We wish to advise you in the strongest possible terms that it is in Ms. Brentzel's to resolve these discrepancies before submitting a completed proof of claim at the request of AIG pursuant to the terms of the Policy, the form of which is enclosed with this letter."  Aside from the fact that McFadden seems to have forgotten whom he represented, and, from this statement, was ignorant of the fact that multiple policies were involved, this was the first time that anyone associated with AIG or AIGPCC had made reference to "a completed proof of claim," on a specified form.   A reasonable person in these circumstances would think that the voluminous material previously submitted was more than adequate "proof of claim."  But McFadden's letter

was not concerned with reason; its purpose was to threaten, intimidate, and abuse AIGPCC's customer, who already had paid her money, so that AIGPCC might evade its lawful contractual obligation to indemnify.

(c) Yates already had been told by Tress, in late December, that AIGPCC's "management" was reviewing the claim.  Shortly over one month later, Yates is notified that AIGPCC had hired an outside law firm merely to "represent" AIGPCC in connection with the claims-adjustment process, which usually is handled entirely by internal personnel like Tress.  A fair inference is that "management" had made a decision going beyond the claims-adjustment process.

(d) We also know that AIGPCC's management was under pressure to improve financial results.  In the year 2017 alone, AIG Parent's North America-General segment, of which AIGPCC is a part, posted underwriting losses of a staggering $3.4 billion, on premium revenues of $ 11.5 billion (see paragraphs 7-8 above).   In other words, for every premium dollar they took in, they paid out a $1.30.  Even now, AIG Parent continues to place pressure on the North America segment to "be focused on making progress towards improved underwriting results and efficiencies" (AIG Parent 10-K Report for 2019, page 78).  That euphemism can mean only one thing in this context: as AIGPCC and its sister companies were unlikely to be able to raise their already-high premium rates, the only route toward "improved underwriting results" would be to reduce claims pay-outs.

45.  McFadden's letter of February 21, 2017, also was woefully deficient on truth, and on materiality to AIGPCC's contractual obligation to indemnity, or any reasonable claim adjustment process.  McFadden's alleged "discrepancies" amount to nothing much at all; and were in every instance both contrived and immaterial under applicable policy provisions.  In particular:

14

(a) McFadden's letter begins with what he characterizes as "a single, over-arching" question: how a claim that began as one for damages to a small fraction of the items moved from Ms. Brentzel's Virginia residence to the storage facility at Fairfax Transfer and Storage ("FT&S"), and then brought to Ms. Brentzel's Georgetown residence on July 21, 22, and 24, morphed, some fourteen months later, into a theft claim of some $1.6 million that now has no damaged goods component to it and appears to involve not only some of the goods transferred in the move, but 'items that were already in the 28th Street home that were there prior to the Middleburg move.'" (McFadden letter, 2/21/17, page 2).  McFadden then goes on to quibble about the exact date of the thefts, the property stolen, and the exact sequence of storage and moving–without denying that there was a theft by an employee of Fairfax Transfer, who was convicted and went to jail for it.  None of McFadden's debating points are "discrepancies" at all, and none are material, in any way, shape, or form, to AIGPCC's contractual obligation to indemnify, which covers damage, theft, or loss of any kind, and, in this sequence of events, the admitted fact of the theft shows that at least two occurrences, and three different policies, were involved.  This one non-discrepancy shows that AIGPCC already was on the hook for insurance limits ranging from $4.5 million to $8 million, depending upon what was taken when.  However, that variation in insurance limits had nothing to do with whether the losses were required to be indemnified by AIGPCC.

(b) McFadden's letter then goes on to raise equally trivial, and equally immaterial, questions about the "character of the loss" (pages 2-4), the "timeline of the loss" (pages 5-6), and the "perpetrators of the loss" (pages 6-7).  Like his opening point, none of these points have anything to do with AIGPCC obligations to indemnify under the applicable policies. They are sound and fury, signifying nothing.

15

(c) McFadden then raises multiple questions about the inventories of missing goods and the valuation thereof (pages 7-8). As in the case of his "over-arching question," here McFadden seems to lack a sense of time, and he seems willfully blind to the advice from Yates in his letter of November 2016 to Tress that the letter partially superseded the previous submissions. McFadden chooses to ignore that obvious fact, and instead to harp on "discrepancies" that exist only in his imagination. Elsewhere in his letter, McFadden claims to have read and studied Yates's previous letter, but McFadden apparently did not read the closing sentences; or thought it expedient to feign ignorance. McFadden also failed to acknowledge – as the AIGPCC correspondences have done throughout–that the applicable policies themselves include a process for resolving disputes over the valuations of property loss claims. (Homeowners' Policies, Part IV, Section M). So, here too McFadden's point is completely immaterial to AIGPCC's contractual obligation to indemnify.

(d) McFadden concludes his "discrepancies" dissertation with some other wooden-headed points, such as a supposed ambiguity as to which of several policies may be involved, or the identity of Hacker as an insured (page 8). The only possible inference that could be drawn from these statements is that it is a rather awkward attempt at prevarication. Does McFadden actually think that anyone could believe that he, the lead lawyer for AIGPCC, had not already ascertained what policies had been issued, and to whom? All four policies involved in this case had been issued to Ms. Brentzel and Mr. Hacker jointly, and were delivered simultaneously, together with 4 other policies (three auto policies and one excess liability policy). Three of the four policies name Brentzel and Hacker as primary insureds; only the Virginia residence policy names only Brentzel, but of course it provides for coverage of a cohabiting spouse, as Hacker was. It also is not clear what McFadden was trying to accomplish with this point, other than to

16

intimidate and abuse, because, in the circumstances already known to and conceded by AIGPCC, this issue has no effect whatsoever on AIGPCC's contractual obligation to indemnify. It was just some more smoke.

(e) McFadden then closes out his letter of February 21, 2017, with two more paragraphs of prevarication, promising on the one hand that "[w]e intend to continue our investigation"(page 8), while also contending, falsely, that it was "essential . . . to any further consideration of the claim that these questions and discrepancies be resolved" (*id.*). That last statement was one that no reasonable person in possession of the facts could believe, because AIGPCC already had more than sufficient information to conclude that it had a subsisting obligation to indemnity the plaintiffs under one or more of the policies that it had sold to the plaintiffs, under its marketing strategy of targeting "high net worth" individuals when selling this type of insurance. Any quibble that AIGPCC may or may not have had about the amount of loss was no ground for denying or delaying its processing of the claim.

### *Two and a half more years of AIGPCC's war on its own insureds*

46. The attempted intimidation of the McFadden letter did not work, though it did produce further delay while Yates seemingly puzzled over exactly what it was that could satisfy AIGPCC's new outside counsel. During this period, AIGPCC also seemed content to allow more time to pass; it was "on strike" until further notice.

47. Finally, on or about October 2, 2017, Tress re-entered the picture to launch the next escalation in AIGPCC's war against plaintiff Brentzel. By a letter of that date, AIGPCC began to threaten to close the file and deny the plaintiffs' claim in its entirety, though of course there was no basis in the policy for that action. Even with all of McFadden's quibbles, there was

undoubtedly enough undisputed information in AIGPCC's possession to establish, beyond any shadow of a doubt, that there had been one or more–and probably several–insured occurrences that gave rise to AIGPCC's contractual obligation to indemnify.  So, Tress's threat to repudiate that obligation was simply another abusive and dishonest act.  The last fig leaf was the formal "proof of loss" form, which Tress's letter demanded by November 1 of that year.

48.   After obtaining a 3-week extension of the deadline newly imposed by Tress, Yates forwarded the plaintiffs' sworn statement of proof of loss, with a cover letter dated November 21, 2017, that responded to McFadden's letter of February 21, essentially by reiterating the information previously provided by the plaintiffs to AIGPCC one year before, with a few minor updates, such as plaintiff Brentzel's meeting with the Virginia State Police on December 9, 2016, to convey information to that agency concerning the thefts–information that already was in AIGPCC's possession through Yate's submission of November 2016.  So, this was another meaningless exercise that had been imposed on the plaintiffs and their counsel, for no substantive reason.  Moreover, also enclosed with the Yates letter was the Statement of Proof of Loss, signed and sworn to by Brentzel, and incorporating by reference two attached exhibits:

(a) Exhibit A consisted of copies of the declarations pages and policy language of all four relevant policies for the contract year 2015-16.

(b) Exhibit B consisted of detailed descriptions of each and every item comprising the claimed loss, and its valuation, usually by reference to its original purchase price, from which anyone could deduce its replacement cost, which was the standard of reimbursement under all of the residential policies.  This item-by-item description goes on for 76 pages, and the total replacement cost claimed was $1,107,606.29.

49.   At the level of detail represented by the claim submission of November 21, 2017,

one would have thought that even McFadden would be satisfied.  But this was not to be.
AIGPCC and its attorneys simply continued to churn what was increasingly bearing the earmarks
of a sham "investigation" process, conducted in bad faith, and create an undue burden on the
plaintiffs.  The next round in this program was a responsive letter from McFadden, dated a mere
9 days later, on November 30, 2017, demanding an oral examination under oath of Ms. Brentzel,
and the production of further documents based upon the minor updates provided in Yates's letter
of November 21.  However, McFadden's letter of November 30 did not explain why Ms.
Brentzel's sworn written statement was unsatisfactory; instead, he merely referred to policy
language that McFadden seemed to contend was AIGPCC's absolute right, regardless of
substance, or, as was the fact, in the complete absence of any material issue concerning
AIGPCC's contractual obligation to indemnify, which had been established by the information
submitted one year previously.

50.  The demanded oral examination under oath of Ms. Brentzel went forward on
February 27, 2018, with the examination conducted by McFadden, at his law office in
Washington, D.C.  Also appearing for AIG (whether for AIG Parent or AIGPCC is unclear on
the transcript) were Tress, and another partner from McFadden's firm, a Mr. Jeffrey D.
Grossman from the main Philadelphia office of the firm.  This was the first time that Grossman
emerged from the shadows, and he would take a leading role in subsequent events.  However, on
February 27, 2018, McFadden was presented in the lead, and he examined Ms. Brentzel all day,
from 9:26 A.M. to 5:15 P.M., producing some 328 pages of transcript.  While the court reporter
loosely referred to these proceedings as a "deposition" (Tr.328), even the most superficial
examination of the transcript shows that it was more like an inquisition, replete with the kind of
leading and accusatory questioning more appropriate to a cross-examination of a hostile witness

at trial, and there can be no doubt that McFadden's questioning was permeated by hostility toward Ms. Brentzel.   That pattern simply was a continuation of the strategy set in McFadden's letter of a year earlier.   In terms of substance, McFadden's examination had none: it was an endless rehash of the sort of trivia that characterized his earlier letter, and completely immaterial to AIGPCC's contractual obligation to indemnify the plaintiffs for their insured losses.

51.   McFadden followed up the pointless oral examination of February 27, 2018, with an equally pointless, and even more abusive, letter of April 6, 2018 (which was erroneously dated 2017).   In this letter, McFadden escalated the attack to an entirely new level of harassment. Now, AIGPCC wanted to know virtually everything imaginable about Ms. Brentzel's personal life.   McFadden demanded "[a]ddresses, copies of leases, and periods of occupancy for each home in which Ms. Brentzel lived, full- or part-time, from 2015 to the present, including, but not limited to" (Letter, page 3), followed by an enumeration of 11 different locations, including two in Pennsylvania that appear to be relatives' homes; and two in Switzerland that appear to be hotels.   One might ask why.   McFadden's letter gives no answer, and there is no apparent answer consistent with the process of insurance claim processing.   The policies under which the insurance claim was made provide coverage of household contents consisting of personal property at any place on earth, when such contents are not located in the insured residence. (Policy, Part II, §B.2.c).   The valuables policy has no geographic restriction.   So, what did it matter where Ms. Brentzel lived, especially part-time?   Under the facts as known to McFadden at that time, it did not matter one whit to insurance coverage.   But he demanded the information anyway, as a pretext for further delaying, and ultimately denying, AIGPCC's rightful obligations to the plaintiffs.   Or, perhaps he thought he was being clever, by gathering up "ammunition" to use against Ms. Brentzel, in the event she decided to press her legal rights against AIGPCC.   But

this is not a lawful or honest use of the insurance claim adjustment process, which does not provide for pre-lawsuit "discovery" from the prospective plaintiff.

52.   The remaining contents of McFadden's April 6, 2018 letter are much the same. McFadden demanded "[c]ontact information (address, phone number(s), and email address(es))" (Letter, page 2) for 22 named individuals, all or substantially all of whom already had been known to AIGPCC, now for nearly 18 months. McFadden demanded a copy of Ms. Brentzel's passport. (Letter, page 4).  He wanted to force Ms. Brentzel to categorize the hundreds of lost or stolen items in relation to the particular policy covering that loss (Letter, page 1)–another completely pointless operation that doubtlessly would have been attacked by McFadden, no matter what it said.  He wanted to know which of the lost or stolen items had been "gifts or family heirlooms" (Letter, page 2), and for identification of the gift-giver and the date of the gift (*id.*)–none of which had the slightest bearing on either the homeowners' policy coverage or the valuation of these items under the policy.  Gifts and heirlooms are covered just the same as purchases.  It certainly seems a fair inference that anything that popped into McFadden's head to burden, harass, or possibly embarrass Mr. Brentzel ended up in this letter, which reflects rather a prurient sense of curiosity and voyeurism on the part of McFadden.  The only possible explanation for this outlandish behavior is harassment and delay of the plaintiffs' claim, or, as noted above, improperly premature "discovery," which would not have been relevant even if a lawsuit had been pending, which it was not at that time.

53.   In response to the April 6 letter, Yates, on behalf of Hacker and Brentzel, filed a second lawsuit in the Virginia Circuit Court in Loudoun County, on May 10, 2018, essentially equivalent to the action filed in December 2016 and withdrawn in November 2017.  Yates explained in a May 11 email to McFadden and Grossman that the new filing was intended to

meet a six-month period after the previous discontinuance, referring back to that event as coming

at a time when "we were still working things out." Although he should have lost his illusions

about AIGPCC's designs by this time, Yates once again did not effectuate the service of a

summons.

54. The flurry of activity culminating in the McFadden letter of April 6, 2018, and the re-

filing of the state declaratory judgment on May 10, was followed by a lull for the next few

months. In November 2018, Ms. Brentzel's attention was diverted by the death of her husband,

Hacker, and the need to get his estate into order, by applying for and receiving an appointment as

Hacker's personal representative and letters of administration for his estate in mid-December

2018. Shortly thereafter, AIGPCC's attorneys went back into action to launch the final phase of

their war on the now-widowed Ms. Brentzel.

55. In late January 2019, AIGPCC's outside attorneys contacted Yates. At this stage, we

do not know the content of that communication. However, we do know that, on February 20,

2019, less than one month later, Yates wrote to Brentzel, notifying her of his intention to

withdraw from the representation, citing as a reason that Brentzel was behind in paying Yates's

bill, and enclosing a copy of his motion to withdraw as counsel of record in the state court action

in Loudoun County Circuit Court, which was granted by the court on April 5, 2019. Brentzel

continued for several months without counsel, before obtaining new counsel in or about January

2020, with their first court filing being made on January 31, 2020. Unlike previous filings in the

case, all subsequent filings were served upon AIGPCC, which appeared specially to seek a

dismissal of the case with prejudice. That motion was denied by the court, and plaintiffs' motion

for a voluntary non-suit, without prejudice, was granted by the court on February 7, 2020, over

the objection of counsel for AIGPCC, represented in that case by another member of the

22

Washington, D.C. office of the same Philadelphia law firm with which McFadden and Grossman are associated.  However, AIGPCC was well aware of this action long before this time; and admitted as much in a letter to Brentzel in September 2019.

### *AIGPCC's Repudiation of its Obligations*

56.  By a letter dated September 13, 2019, signed by Grossman, AIGPCC finally got around to admitting what had been apparent for many months previously, which is that it had decided to close its file and was denying the plaintiffs' claim in its entirety.  The claimed reason was stated only summarily, with no explanation or analysis of the putative "issues" that AIGPCC's attorneys pretended to perceive.  Here are the exact words: "due to lack of communication, cooperation, and sufficient proof of the claimed losses."  This terse denial was a wholesale repudiation of AIGPCC's lawful obligations under its insurance agreements with the plaintiffs, and under Virginia insurance law to act reasonably and explain itself.  This statement, like so many statements made in the course of the previous threes of pretension, evasion, and nonsense, was a deliberate lie, as is shown in depth by the matters alleged above: plaintiffs and their counsel had provided more than the "reasonable" cooperation required by Part IV of the policies, in all particulars; they had responded to every communication made by AIGPCC, and provided more than sufficient proof of the claimed losses.  No one, not even AIGPCC's own attorneys, had denied the existence of insured losses.  Moreover, in this letter, as in previous communications, there is no mention made of the fact that disputes over the amount of a loss, if there actually were any on the part of AIGPCC– which itself seems dubious in light of their behavior–do not justify denial of a claim in its entirety under the relevant Policies, which instead provide for an independent arbitral procedure (Part IV, § M).  Thus, the September 13, 2019

letter from Grossman, on behalf of AIGPCC, was both dishonest and inaccurate in fact, and frivolous in law, as contrary to the parties' contract and to the regulatory requirements of Virginia insurance law.

## COUNT I

### (Breach of Insurance Contracts)

57.  Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-56 above.

58.  The policies issued to plaintiffs and signed by officers of AIGPCC were valid and subsisting legal obligations of AIGPCC, which breached those obligations in several different ways, as set forth in paragraphs 60-63, below, which are stated in the alternative.

59.  All conditions precedent to AIGPCC's obligations to perform on its promises as made in the contract, and its obligations to conduct its business in accordance with Virginia law, have been satisfied or are excused.  While a claimant is not required under Federal Civil Rule 9(c) to state particulars, in the alternative, and in the interest of avoiding baseless denials and unnecessary motions practice, plaintiffs call the Court's attention to the following particulars:

(a) All three of the residential policies involved in this case contain a Part IV entitled "Conditions," although policies issued in different states have slight variations in language.  In the standard policy language, § I of Part IV Provides that: "Any provision of this policy, which is in conflict with state or local law, is amended to conform to the law." In Virginia, there are several such laws that must be taken into account when construing the conditions prescribed by policy law.  First, all such policies must be construed to include a general duty of good faith and fair dealing.  Second, all such policies are subject to insurance statutes and regulations, importantly including Va. Code § 38.2-510, and the regulations prescribed thereunder, including

14 VAC VAC5-400-70, which are discussed below in paragraphs 61-63.  In addition, Va. Code §

38.2-314 governs the interpretation of § L of Part IV (which already is modified under a Virginia

Amendatory Endorsement).  Va. Code § 38.2-314 provides as follows:

> "No provision in any insurance policy shall be valid if it limits the time within
> which an action may be brought to less than one year after the loss occurs or the
> cause of action accrues.

> "If an insurance policy requires a proof of loss, damage or liability to be filed within a
> specified time, all time consumed in an effort to adjust the claim shall not be considered
> part of such time."

As applied in this case, § 38.2-314 requires that no contractual limitation of time can begin to run

until September 13, 2019 at the earliest, since all other time from the underlying occurrence to

that date was "consumed in an effort to adjust the claim," and further that no cause of action

accrued until that date.  So, neither the standard policy language nor the Virginia Amendatory

Endorsement language (which extends the time from one year to two years) governs this case.

       (b) Aside from time limitations, we would expect the defendant to contest the

"cooperation" conditions in § B of part IV, because that was a summary ground given for

AIGPCC for its denial of the claim.  However, on the allegations in this complaint, all such

conditions are satisfied, excused, or invalid under Virginia law.  Under policy language, the

common law, and insurance regulation, the insured's duty to cooperate is limited to reasonable

requests, and some of AIGPCC's demands exceeded the bounds of reason and were lacking in

good faith.  For approximately the first three years of claim-processing, plaintiffs' compliance

with AIGPCC's demands were perfect tender: AIGPCC was promptly notified of the losses;

plaintiffs submitted voluminous documentation of the losses and detailed descriptions of the

circumstances of the losses; plaintiffs made police reports of thefts; plaintiffs timely submitted a

written proof of claim form, signed under oath, and submitted to an oral examination under oath

by AIGPCC.  (See the allegations set forth in paragraphs 28-34, 37-42, and 46-50, above.)  It was only after AIGPCC's demands plainly exceeded the bounds of good faith and materiality to coverage of the underlying losses that the plaintiffs began to balk–at such things as demands for production of Brentzel's passport, accounting for Brentzel's visits to her relatives in Pennsylvania, her hotel stays in Switzerland, and the like.  (See the allegations set forth in paragraphs 51-55 above).  These demands wholly exceeded the bounds of reason and decency and were made in bad faith. (See the allegations set forth in paragraph 63, below).  Accordingly, the cooperation condition should be deemed satisfied by substantial performance; or excused by defendant's bad faith.

(c) The appraisal condition (§ M of Part IV) was never invoked by either party.  In fact, AIGPCC never actually claimed that there was a dispute over the amount of the loss and did not do so even in its denial letter, which is a sign of bad faith, because some quantum of insured loss was indisputable and undisputed by AIGPCC.  Therefore, this condition was satisfied, or simply inapplicable.

 (d) None of the other conditions in the policies are applicable, because none of them excuse or justify the non-performance and repudiation by AIGPCC.

60.  Through the Grossman letter of September 13, 2019, AIGPCC breached all of the relevant policies through complete repudiation of its contractual obligations to indemnify the plaintiffs, and to administer those policies in accordance with their provisions.

61.  The Grossman letter of September 13, 2019, also violated: (a) the general duties of good faith and fair dealing implied in all such contracts; and (2) the specific provisions of Va. Code § 38.2-510, setting forth unfair and unlawful claim settlement practices by insurers, and Virginia Administrative Code Title 14, Department 5, Chapter 400, Section 70 (14 VAC5-400-

26

70).  Subdivision B of 14 VAC5-400-70 provides that:

> "An insurer shall provide a reasonable written explanation of the basis for any claim denial. The written explanation shall provide a specific reference to a policy provision, condition, or exclusion, if any."

The Grossman letter provides no explanation at all, much less a reasonable one.  Further, AIGPCC's denial of the claim also violates Subdivision D of 14 VAC5-400-70, which provides that:

> "An insurer shall not unreasonably refuse to pay any claim in accordance with the provisions of the policy."

As set forth in detail by the charging allegations above, AIGPCC never had any basis at all for refusing to pay plaintiffs' claim, and no reasonable person would refuse, given the provisions of the policy, which plainly cover the losses sustained, and put the lie to AIGPCC's feigned "discrepancies," which are in every instance immaterial to coverage of the underlying losses under the relevant policies.

62.  The entire process of AIGPCC's conduct, as alleged above, was, at least from and after September 2016, through and including September 13, 2019, an ongoing and continuous breach of:  (a) the general duties of good faith and fair dealing implied in all such contracts; and (2) the specific provisions of Va. Code § 38.2-510, setting forth unfair and unlawful claim settlement practices by insurers.  AIGPCC deliberately misled the plaintiffs in this regard, and fraudulently concealed the true nature of its activities.

63.  From approximately January 2017 onward, AIGPCC's course of conduct had ripened into an affirmatively dishonest and deceptive pattern of bad faith behavior, in that:

(a) AIGPCC was only pretending to go forward with a claim investigation and adjustment process;

(b) a fair inference from the known facts is that AIGPCC's "management"– as it was referred to in the December 28, 2016 email from Tress to Yates–shortly thereafter had decided to deny plaintiff's claims in their entirety, without regard to AIGPCC's indemnity obligations under the policies, and regardless of any supplemental information provided;

(c) AIGPCC's incessant and escalating requests for additional information, statements, sworn testimony, and documents, were not any part of a good faith effort to investigate or adjust the plaintiffs' claims, and therefore AIGPCC's repeated statements, in letters to the plaintiffs and their counsel, to the effect that AIGPCC was continuing to process the plaintiffs' claims, were false and deceptive statements;

(d) In fact, the real purpose of AIGPCC's sham "investigation" was to delay, discourage, insult, abuse, and exhaust the plaintiffs, especially plaintiff Brentzel, and to gather extralegal "discovery" of matters concerning Brentzel's personal life, in the hope of uncovering "ammunition" to embarrass plaintiff Brentzel, or discredit her future testimony in an action against AIGPCC, which is an improper and dishonest use of the claims-adjustment process by an insurer;

(e) Nearly all of the supplemental information sought by AIGPCC from and after January 2017 was immaterial to the coverage of losses under the policies, and no reasonable person could have believed otherwise; and

(f) further confirmation of AIGPCC's pattern of bad faith is shown by its treatment of the amount of the loss, by failing to invoke or even mention the appraisal process provided for in Part IV, § M of the policies; and therefore

(g) no objective and reasonable person could believe in that a complete refusal to provide any indemnification–not one penny on a claim that even AIGPCC conceded was a million-

dollar-plus claim–was a reasonable, good faith resolution of the claims adjustment process under these policies.

64.   Wherefore, plaintiffs demand judgment in the amount necessary to place them in the same position they would have been in, had AIGPCC fully performed rather than breached its obligations under the contracts, which amount is estimated to be at least $ 1,107,606.29, plus the unnecessary costs foisted upon the plaintiffs by AIGPCC's sham "investigation" activities from and after January 2017 to the date of judgment herein, which amount is estimated to be at least $100,000., and such other and further relief in favor of the plaintiffs as this Court may deem just, proper, and equitable.

## COUNT II

### (Bad Faith by an Insurer in Denying Coverage
### or Failing or Refusing to Pay the Insured)

65.   Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-56, and 58-64 above.

66.   This count is based upon the common law, or, in the alternative, on Va. Code § 38.2-209.

67.   Bad faith by an insurer in the ostensible performance of claims adjustment procedure, or bad faith by an insurer in denying coverage or failing or refusing the pay the insured as required under the provisions of the applicable policy is actionable at law, either alone or, in the alternative, as a supplemental remedy to a breach of contract claim against the insurer.

68.   As an alternative ground, Va. Code § 38.2-209 authorizes an award of attorney fees, where:

"in any civil case in which an insured individual sues his insurer to determine

what coverage, if any, exists under his present policy or fidelity bond or the extent to which his insurer is liable for compensating a covered loss, the individual insured shall be entitled to recover from the insurer costs and such reasonable attorney fees as the court may award. However, these costs and attorney's fees shall not be awarded unless the court determines that the insurer, not acting in good faith, has either denied coverage or failed or refused to make payment to the insured under the policy."

Va. Code § 38.2-209.

69.   Under either standard, the allegations set forth above amply show AIGPCC's bad faith in denying coverage.  In particular, the allegations set forth in paragraphs 61-63 above, based in turn on the detailed factual allegations set forth in paragraphs 35-56 above, demonstrates AIGPCC's bad faith.  No objective observer could agree that AIGPCC's position of complete denial of the plaintiffs' claims was reasonable.  Indeed, no one associated with AIGPCC even suggested that there was no covered loss.  Instead, they nitpicked about immaterial matters that did not in any way bear on the coverage of the claimed losses, even when denying the claim in its entirety, based upon alleged procedural deficiencies in the plaintiffs' cooperation–alleged "deficiencies" that were in no way supported by the policy language, or by the facts.

70.   Wherefore, plaintiffs demand judgment on this Count II, of an amount necessary to reimburse the plaintiffs for the costs and a reasonable attorney's fee in bringing this action to judgment, and, to the extent not included in the award on Count I, for interest at the legal rate on the proper amount of indemnification to the plaintiffs due and owing under the policies, from the date it should have been paid by AIGPCC–which should be no later than January 1, 2017–to and including the date that such indemnification actually is paid, and for such other and further relief as  this Court may deem just, proper, and equitable.  .

WHEREFORE, the plaintiffs pray for relief as follows:

(1) On Count I, an award of compensatory damages in the amount of at least $1,207,606.29;

(2) On Count II, costs and a reasonable attorney's fee, in bringing this action to judgment, plus, to the extent not awarded under Count I, pre-judgment interest at the legal rate on the amount of contractual indemnification unlawfully withheld in bad faith, on the excess processing costs imposed on the plaintiffs by the defendant in bad faith, with prejudgment interest at the legal rate;

(3) on all monetary awards combined, post-judgment interest at the legal rate;

(4) under 28 U.S.C. §§ 2201-2202, a declaratory judgment that the conduct revealed in this case on the part of AIGPCC is repugnant to the public policy of the Commonwealth of Virginia, as reflected in the statutes and regulations governing the business of insurance in Virginia; and

(5) such other and further relief in favor of the plaintiffs as this Court may deem just, proper, and equitable.

Dated: September 9, 2020

Respectfully submitted,

*/s/ James R. Tate*
James R. Tate, Esq. (Virginia State Bar Number 6241)
TATE BYWATER
2740 Chain Bridge Road
Vienna, Virginia 22181
Tel: (703) 938-5100
Fax: (703) 991-0605
jtate@tatebywater.com
*Counsel for Plaintiffs Catherine M. Brentzel and*
*Estate of Robert C. Hacker*