**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| CATHY MARIE BRENTZEL, | ) |
| | ) |
| ESTATE OF ROBERT C. HACKER | ) |
| | ) |
| | ) |
| Plaintiffs | ) Case No. 1:20-cv-1055-TSE-MSN |
| | ) |
| v. | ) |
| | ) |
| AIG PROPERTY CASUALTY COMPANY, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**PLAINTIFFS' BRIEF IN OPPOSITION TO THE DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT**

Plaintiffs submit this brief, and the accompanying affidavit of James R. Tate, in opposition to the defendant's motion for summary judgment, which purports to be based on contractual time limitations as set out in the underlying insurance policies involved in this case. The motion is completely devoid of merit, and should be denied in its entirety. The contractual provisions on which the defendant relies are hopelessly incoherent, and ultimately they violate the important Virginia public policy of affording the insurance consumer a fair chance to have her claim heard.  Virginia law provides this Court with the tools needed to set matters right.

**STATEMENT OF THE CASE**

In order to fully appreciate the issues presented by the defendant's motion, the Court should step back and consider how we got here.

**The Parties**

The plaintiffs were a married couple of substantial means who maintained several

1

different residences, one in Virginia, and two others in the District of Columbia.[1]  Homeowners insurance policies on all three of those residences were carried by the Defendant.  Those policies were part of a much larger portfolio of insurance maintained by the plaintiffs and arranged through their insurance broker, a firm named AON, all underwritten by the Defendant or one of its affiliates.  In addition to the homeowners policies, this portfolio included a separate valuables policy, several automobile policies, an excess liability policy, and a kidnap and ransom policy.  During the two policy years covering the underlying events in this case, the couple paid total premiums of over $45,000 per year,[2] totaling over $90,000, with property limits alone totaling approximately $5.8 million.  What they got in exchange from this Defendant, in terms of either coverage or consideration, was nothing.

The Defendant, hereinafter "AIGPCC," is a small, indirect operating subsidiary of the insurance and financial giant American International Group, Inc. (hereinafter "AIG").  While AIG remains a large company, it is a shadow of its former self, having lost over 80% of its market value[3] after being the recipient of one of the largest government bailouts of a private firm in the history of the United States during the height of the liquidity crisis in 2008.[4]  But even now, over 12 years later, AIG still is having trouble in staying afloat in its conventional

[1] During the long gestation period of this AIG matter, the husband, Mr. Hacker, passed away in 2018 after a long illness, and so his estate is the nominal second plaintiff.
[2] See Premium Cost Summary, p.14 of Personal Insurance Program for Robert Hacker & Cathy Brentzel, 2015-16, by AON, dated 6/12/15 (Tate Aff., Ex. 1).
[3] Exhibits 2 and 3 to the Tate Affidavit are copies of the cover pages to AIG's 10-K reports to the SEC, dated February 28, 2008, and February 9, 2021, respectively.  These show a drop in the declared aggregate equity value of AIG from $152.28 billion in 2008 to $26.86 billion in 2021.  By way of comparison, during this same period, the Dow Jones Industrial Average first fell, in the wake of the liquidity crisis, to a low of 6,547.05 on March 9, 2009, but since then has been rising steadily to its current value of 31,270.09, as of the close of trading on March 3, 2021. *See* www.finance.yahoo.com.
[4] *See* Jesse Nankin & Krista Schmidt, "History of U.S. Gov't Bailouts."  *ProPublica,* April 15, 2009 (Tate Aff., Ex. 4).  The bailout involved advancing $180 billion in taxpayer dollars to AIG– an amount that was larger than the company's total market value at that time.

insurance business. (*See* AIG 2019 10-K (Tate Aff. Ex.5), at 76).  In terms of homeowners and other similar personal insurance, AIG, by its own admission, targets "high net worth individuals" like Ms. Brentzel and Mr. Hacker.   (*See id.*at 78).

**The Underlying Events**

In June 2015, the plaintiffs decided to move the entire contents of their rented home in Virginia into one of their D.C. homes, located at 1607 28th Street in the Georgetown area of the city.  At that time, they carried $1.17 million in insurance on the contents of the Virginia home, and another $3.33 million on the contents of the Georgetown home.  (*See* Tate Aff., Ex. 1, at 4, 6).  As events unfolded, this $4.5 million in insurance coverage from AIG turned out to be worthless.

Ms. Brentzel was the named insured on the Virginia home and took charge of the move, for which Fairfax Transfer and Storage, Inc., of Lorton, Virginia (hereinafter "Fairfax Transfer") was engaged.  Regrettably, Ms. Brentzel delegated the physical supervision of the move to one of her household assistants, David Lamonde, who turned out to be disloyal and dishonest. Contrary to Ms. Brentzel's orders, from the beginning Lamonde deviated from the plan and failed to insist that Fairfax Transfer simply move the goods from Virginia to DC.[5]  Ms. Brentzel was traveling out of the country, and by the time of her return in July she learned that her goods had not been sent directly to DC but rather stored somewhere in Virginia in the custody of Fairfax Transfer, to whom she complained vociferously, both on the telephone and in writing.

---

[5] Exhibit 6 to the Tate Affidavit contains copies of delivery tickets and invoices from Fairfax Transfer's records.  Pages 3 and 4 of that Exhibit appear to show a 15-hour move from the Virginia house, ending at 1:30 a.m. on June 24, 2015, to an unidentified warehouse, for which Ms. Brentzel is billed both an "in charge" and "monthly storage."  The illegible signatures on those documents may be those of David Lamonde, but we actually do not know that.

(Ex. 21.).  She also notified AIGPCC of the problem at about this same time.[6]  Before she could get any kind of explanation from Lamonde, he disappeared from view, and she later learned that Lamonde was a fugitive from justice in several states, and, in late 2016, he was arrested in Pennsylvania on other charges of stealing from his former employers.  (*See* Ex. 21).

By the latter part of July 2015, some of the household goods had begun to show up in D.C. in piecemeal deliveries by Fairfax Transfer that continued into September 2015.[7]  Now we come to one of the major points of contention between the parties: Ms. Brentzel believes that the deliveries may have continued into late 2015 or early 2016 (Ex. 21), while Fairfax Transfer has denied having made any deliveries after September 16, 2015, though its own documents show a delivery a week later (*see* Tate Aff., Ex.6, at 20).  AIGPCC opportunistically shifts its position on the subject for what it perceives to be its tactical advantage, at the moment taking the position that deliveries continued until January 31, 2016 (*see* Def. Mem. 3, 8), but there is no evidence for that specific date, or any particular date, beyond the recollection given by Ms. Brentzel at her deposition.  Defense counsel obviously think that the date they choose, more or less arbitrarily, helps them in their limitations computations.  However, as we show below, it does not.

In any case, by early 2016, it became apparent to Ms. Brentzel that large amounts of goods from the Virginia house were missing from the deliveries to Georgetown by Fairfax Transfer, and she so advised AIGPCC.  What followed was an extremely desultory process of claim examination and adjustment by AIGPCC that extended over the next 3 years and nine months, until September of 2019.

---

[6] All of the later correspondence from AIG refers to a notification date of July 24, 2015.  (*See*, *e.g.*, Tate Aff. Exs. 8-16).

[7] Also in September 2015, one of Fairfax Transfer's employees stole a diamond ring worth $75,000 and $ 10,000 in cash from the Georgetown house.  That man was arrested by the DC police and ultimately pled guilty.  (*See* Tate Aff., Ex.7).  Shockingly, AIG ultimately denied coverage for this loss, as well.  We are still waiting to find out why.

**The Claims-Adjustment Process**

The parties did not actually meet together until September of 2016, when Ms. Brentzel met with AIG representatives at her Georgetown home.  This meeting was followed by a letter dated September 30, 2016, from a Mr. Tress representing AIG (Tate Aff., Ex.8), and that letter set the tone for the next three years of contentious communications from AIG, accompanied by endless requests for ever more detailed information on the missing goods. (Tate Aff., Exs. 9-15). In the meantime, Mrs. Brentzel had mobilized her remaining household staff to assemble a mountain of details to meet AIG's demands. (*See* Tate Aff., ¶ E & Exs 10 and 23.).  That process went on for another 18-20 months, into the Spring of 2019.  The Defendant's current motion now claims that, at some point during this period, the contractual limitations period ran out on the plaintiffs, but of course AIGPCC never said anything of the sort at the time. (*See* Tate Aff., ¶F & Exs. 8-9, 11-12, 14-15.).  To the contrary, AIGPCC kept escalating its demands for more and more detailed information, essentially redundant with what had previously been provided.

The full details of this phase are set out in the Complaint (¶¶ 42-53).  By late 2016, Ms. Brentzel retained counsel, Mr. Yates, to assist her in meeting AIGPCC's demands.  Over the next year, the parties went back and forth in writing, with Ms. Brentzel providing ever more voluminous documentation and AIGPCC always demanding still more.  (Tate Aff., Exs 8-15.). Finally, in late November 2017, at AIGPCC's request, Ms. Brentzel submitted her written and sworn proof of claim.  Mr. Yates was quite punctilious in meeting the timing demanded by AIGPCC, first requesting and being granted a three-week extension of time from AIGPCC's demanded date.  (*See* Tate Aff., Exs. 11-12).  Of course, AIGPCC's response of November 30 (Tate Aff., Ex. 14), as had all of its previous correspondence with Ms. Brentzel, projected an accusatory and contentious tone, and demanded further information and now a sworn deposition

from Ms. Brentzel, which did go forward for an entire day on February 28, 2018. (Tate Aff., Ex. 21). While AIGPCC's current motion now seems to claim that the contractual limitation period had expired by then–perhaps long expired–it said nothing on the subject at the time, or at any time through and including AIGPCC's denial of coverage letter on September 13, 2019 (Tate Aff., Ex. 16).

In the meantime, Mr. Yates had become concerned about the lack of progress in AIGPCC's claims-adjustment process.  In late 2016, he pressed the AIG's representative for a decision, and was assured that "management" had that matter under discussion.  But that initiative led only to AIG's retention of outside counsel–apparently a litigation specialist–to represent AIG on the remainder of their putative "claims adjustment process." Mr. Yates also made a protective filing of a complaint for declaratory relief in the Virginia Circuit Court for Loudoun County, without serving process, in December 2016. (Tate Aff., Exs. 17-18).  After approximately one year, he took a nonsuit in that case, and, in the Spring of 2018, made a second protective filing (Tate Aff, Ex. 19). That case remained pending into early 2020, also unserved, but AIGPCC actually appeared specially, in order to oppose Mr. Yates' application for a second nonsuit without prejudice, which was sought in connection with Mr. Yates's withdrawal from the representation. (Tate Aff, Ex. 20).  The state court rejected AIGPCC's arguments, and granted a second nonsuit without prejudice in February 2020.  (*Id.*).  While AIGPCC's current motion apparently wants to make something out of this series of events, in fact they are immaterial here, and used simply as another diversion from the main issues made by the motion.

**Proceedings in this Action and the Parallel Action against Fairfax Transfer**

This action was commenced on September 9, 2020, with the filing of the Complaint with

this Court against AIGPCC.  Five days later, a parallel action was filed against Fairfax Transfer,[8] alleging, inter alia, violation of the Carmack Amendment (49 U.S.C. § 14706) (Count I), conversion of the plaintiffs' missing goods, including one count of diverting the plaintiffs' property into an interstate black market in stolen goods (Count II), and another count holding Fairfax Transfer responsible for the larceny (*see* note 7, above) committed on the premises of plaintiffs' Georgetown home in September 2015.[9]  While AIGPCC answered its complaint, Fairfax Transfer moved to dismiss, under its own defense of a contractual time limitation, which had not been pleaded because Fairfax Transfer never answered.  Nevertheless, that motion was granted, and this Court's disposition now is under review in the Court of Appeals (*see* Notice of Appeal, Doc. 18 in the Fairfax Transfer Case), with briefing now deferred by the Circuit mediator to allow the parties to exchange further information (*see* Tate Aff., ¶C & Ex. 24).

Aside from the expected forthcoming discovery from Fairfax Transfer, discovery is closed in the current case.  Last week, the Court granted AIGPCC's motion for a separate trial on its bad faith, and the Magistrate Judge granted plaintiffs' motion to extend discovery so as to permit the pending discovery from Fairfax Transfer to go forward and to be used in this case.

AIGPCC now brings on its motion for summary judgment, primarily based on a contractual time limitation.  That purported limitation is contained in an AIG form policy, in Section IV, paragraph L, as modified slightly by a Virginia amendatory endorsement applicable to the policy on the Virginia residence, and applicable in unmodified form to the policies on the D.C. residences.  (Tate Aff., Ex. 1, at 42 & 57-58)  The language in question is not a standard

---

[8] *Cathy Brentzel, et ano. v. Fairfax Transfer and Storage, Inc.*, Case 1: 20-cv-01076, filed 09/14/20, E.D. Va., Alexandria Division.  That case also was assigned to Judge Ellis as related to the AIGPCC case.
[9] *See Complaint*, Document 1 in Case 1:20-cv-01076 (hereinafter cited as the "Fairfax Transfer Case").

Virginia insurance policy term; it appears to be entirely the creation of AIG.  It also is largely incoherent, and manifestly unfair, and that is the principal basis for our opposition to the motion.

**Response to the Defendant's "Statement of Material Undisputed Facts"**

Defendant abuses the purpose of this Court's Local Rule on summary judgment, by re-labeling a portion of its highly contentious factual argument to track that Rule.  In particular, we object to the highly argumentative and wholly misleading presentation of what it calls "peculiarities" of plaintiffs' insurance claim (*see* Def. Mem.3, ¶3): this kind of rhetoric belongs in their closing argument to the jury, and is immaterial to the current motion.  These are just the kind of misleading half-truths in which AIG and its counsel excel.

As regards the remainder of AIG's statement, paragraph 1 is only partially true, because the case also concerns the theft of goods directly from the Georgetown home, carried out while the movers had access to the house.  Paragraph 2 is unduly tendentious in its use of quotation marks but essentially is accurate in fixing the dates of the loss.  Paragraph 4 is admitted.  As to paragraphs 5 and 6, the issues of which policies coverage which losses are premature and immaterial to the current motion.  Defendant's quotations of policy language appear to be correct, but those documents must speak for themselves.  The first sentence of paragraph 7 is untrue, or at least not supported by the cited exhibit.  The remainder of paragraph 7, and the whole of paragraphs 8 and 9, essentially are correct, but their subject matter is immaterial to Defendant's current motion, and to this case as a whole.  And, as is so typical of this litigant, paragraph 9 presents a misleading half-truth by omitting the fact that AIGPCC, through counsel, entered a special appearance in the second state case to oppose (unsuccessfully) the granting of a nonsuit without prejudice.  (*See* Tate Aff, Ex. 20).

## ARGUMENT

### Summary of Argument

The Defendant's motion is quite a feat of prestidigitation.  While Defendant's memorandum mentions and quotes the policy language at issue in its statement (Def. Mem.3-4), it never quite gets back to discussing what that language is supposed to mean, which is the key to the proper disposition of the motion.  Instead, the Defendant goes off on a whole series of diversionary discussions.  So, our task here is to clear away the various diversions, blow away the smoke, and reposition the mirrors, so the Court may see what actually is going on.

What is actually going on is that AIG has crafted a contractual limitations clause that essentially is incoherent, and, if one tries to apply it as written, ultimately denies its insured any viable remedy whatsoever.  Therefore, the provision is invalid under Virginia law.

### I.  The Policies' Limitations Language Deprives the Plaintiff of Any Viable Remedy, and Therefore Violates Virginia's Public Policy Regarding Insurance.

The law in Virginia is that contractual limitations of time can be valid components of insurance contracts if, but only if, they provide the insured with a reasonable opportunity to vindicate her contractual rights under the policy. That is the test that AIG's policy language fails, because it gives the insured zero opportunity, and zero cannot be reasonable.  Instead the policy languages places the insured a Catch-22 where she is both too late and too early simultaneously, and places the manipulation of that provision solely in the hands of the insurer.  There is nothing like it in the previous case law.

But in order to see this reality, we must first clear away the Defendant's diversionary discussions of (a) the public policy represented by Va. Code § 38.2-314, which is pertinent but

not dispositive in the case but is turned upside down by the Defendant (Point A); and (b) the protracted discussions of tolling and nonsuits, with detailed tabular presentations (*see* Def. Mem. 8-12), which in the end comes to nothing, because the topic is immaterial to this case (Point B).

After clearing away the chaff, the fatal infirmity of the AIG position becomes clear. AIG's policy language is constructed to deny its insured any reasonable or fair opportunity to protect her contractual indemnity rights, and for that reason is invalid.  (Point C, below).  And even if something remained, AIG would be estopped by its behavior from raising a time bar. (Point D, below.)

Finally, the Defendant's effort to bring D.C. law into the picture is fruitless, because the limitations issues in this case are governed solely by Virginia law (Point E, below).

**A.  Virginia Code § 38.2-314 Represents An Important Statement of Virginia's Public Policy, But It Does Not Control This Case.**

Both sides seem to agree that this statute represents an important statement of Virginia public policy concerning contractual time limitations in insurance policies.  We call this Court's attention to its previous discussion of the nature of § 314 in *MFS International, Inc. v. International Telecom Ltd.*, 50 Supp. 2d 517 (E.D. Va. 1999), which is not directly in point, but did involve a discussion of policy restrictions on contractual modifications of limitations, using Virginia law as an example.  The Court there noted that there are different kinds of statutes bearing on contractual limitations: one is a typical statute of limitation; the other is designed to restrict the contractual options in order the protect one of the parties, and § 314 is of the latter type, specifically applicable to insurance policies:

> "An example of such a statute is Va. Code § 38.2-314, which states that 'no
> provision of any insurance policy shall be valid if it limits the time within which
> an action may be brought to less than one year after the loss occurs or the cause of

> action accrues.' Thus, . . . any insurance policy provision purporting to limit the time for bringing actions to a period less than one year would be invalid in Virginia. Unlike the Virginia statute, which is directed to ensuring that claimants have sufficient time to bring their claims, typical statutes of limitation are meant 'to encourage promptitude in the prosecution of remedies.'"

50 F. Supp. 2d at 522-23 (*quoting from Order of United Commercial Travelers v. Wolfe*, 331

U.S. 586, 608 (1941)).

    The parties here apparently differ dramatically in how we interpret the first sentence of §

314.[10]   We would read the statute in terms of its plain language and plain intendment to act as a

protection for insurance *customers*, not insurance companies.   Thus, the statute is specifying

things that would be invalid.   And, when a statute specifies that X or Y would be invalid, the

most natural reading would be either X or Y would be invalid, i.e., both would be invalid.

    However, the Defendant appears to take a very different view, and turns the statute

around backwards, and upside down, to read as if it said that either X or Y would be permissible,

so long as both were not included in the same contract.   (*See Def. Mem.* 6-7).   That reading does

a great deal of violence to the statutory language, and completely betrays its protective purpose.

AIGPCC reads the statute not as a protection for insurance consumers, but as a license for

insurance companies to prey on their policyholders, by giving them their choice of how to do so.

    There is no authoritative case law supporting either interpretation, and so it is a matter of

---

[10] We set out here the language of the statute, with bracketed numbers added to distinguish the first from the second sentence, which have a different history in the case law:

> "[1] No provision of any insurance policy shall be valid if it limits the time within which an action may be brought to less than one year after the loss occurs or the cause of action accrues.

> "[2] If an insurance policy requires a proof of loss, damage or liability to be filed within a specified time, all time consumed in an effort to adjust the claim shall not be considered part of such time."

Code 1950, § 38-9; 1952, c. 317, § 38.1-341; 1986, c. 562.

first impression for this Court.  The Defendant's lead citation (Def. Mem.6) is an unreported

Fourth Circuit decision, *Mirabile v.  Insurance Company of North America,* 293 F. App'x 213

(4th Cir. 2008), which does not mention the interpretive question presented here–of choosing

between the "accrual" clause and the "loss" clause–and actually was a case involving an accrual

provision and a period of three years, in a litigation under the federal ERISA statute.  The case

has nothing to do with the dispute at bar.  The Defendant's second citation is to the 1962 state

decision in *Ramsey v. Home Ins. Co.*, 203 Va. 502, 125 S.E.2d 201 (1962), involving an

application of the predecessor to what is today sentence [2] of the statute, and did not involve a

contractual limitation at all, and thus also is immaterial to the case at bar.  Similarly, this Court's

previous unreported decision in *Swiacki v. State Farm Ins. Co.,* 2009 WL 106881 (E.D. Va.

2009), cited later in the Defendant's discussion along with a repeated citation to *Ramsey* (Def.

Mem.12) was entirely concerned with an application of sentence [2], not sentence [1], and

therefore is irrelevant to the current issue.[11]  And Defendant's careless citation style continues

throughout: *Koonan v. Blue Cross & Blue Shield of Virginia*, 802 F.Supp. 1424 (E.D. Va.

1992)(cited at Def.Mem.6,8) was, like *Mirabile*, an ERISA case involving accrual-style

limitation alone.[12]  Both *Koonan* and the other cases cited at the head of Defendant's argument

(Def. Mem.6)–*Board of Supervisors v. Sampson,* 235 Va. 516, 369 S.E.2d 178, 180 (1988);

---

[11] Having said this, we also would say that the *Swiacki* reading of sentence [2] certainly is not inevitable, and we continue to believe, as was alleged in the Complaint here (¶59(a)), that a more natural reading is that sentence [2] does refer back to sentence [1], which does not exclude the possibility that sentence [2] also is self-referential, as the Court held in *Swiacki*.  However, the current motion does not require resolution of this question–the *Swiacki* case is simply off-point.
[12] The defendant seems to have missed one by failing to cite the unreported Payne v. Blue Cross & Blue Shield of Virginia, 976 F.2d 727 (Table)(4th Cir. 1992), which was relied upon by *Koonan*, and, like *Koonan* and *Mirabile*, was an ERISA case involving an accrual provision, again having nothing to do with the current case.  Perhaps on this occasion Defendant's counsel was mindful of the 4th Circuit rule prohibiting the citation of such cases as authority–a delicacy otherwise honored only in the breach by the Defendant's papers.

*Belrose v. Hartford Life & Acc. Ins. Co.*, 478 F. App'x 21, 24 (4th Cir. 2012); and *Board of Supervisors of Fairfax County v. Sentry Ins.*, 239 Va. 622, 391 S.E.2d 273 (1990)–all are cited for the proposition that Virginia law allows for contractual limitation periods shorter than those prescribed by the general statutes–a proposition that we do not dispute.  But they also stand for the proposition that such provisions are valid only "when they were not against public policy and the time period was not unreasonably short," *Board of Supervisors v. Sentry*, *supra*, 391 S.E. 2d at 275 (also quoted at Def. Mem. 6)–a proposition that we affirmatively invoke, as it states the public policy limitation that was violated by the AIG form clause at issue in this case.

We have now disposed of all Virginia cases cited by the Defendant–either properly or improperly–in this portion of its memorandum, with the exception of seven D.C. cases string-cited at page 7 of the memo.  As we explain below (Point E), all of these cases are simply inapposite here, because the limitations issues in this action are governed solely by Virginia law.

**B.  The Defendant's Diversionary Arguments About Tolling and Nonsuits Are Extraneous to the Case.**

The Defendant's next diversion (Def. Mem. 8-12) need not detain us long, because it has nothing to with the issues in this case.  In this regard, the Defendant sets up a straw man consisting of Mr. Yates' filings and non-suits from late 2016 through early 2020 in the Virginia state circuit court in Loudoun County.  It is certainly true that AIG's various machinations may have had Mr. Yates worn to a frazzle, and gotten him confused about the limitations situation, until he finally gave up and withdrew from the representation in early 2020.  But these matters have nothing to do with the limitations issues in this case, and the Defendant's additional citations here–*Simon v. Forer*, 265 Va. 483, 578 S.E.2d 792 (2003); and  *Ticonderoga Farms*

13

*Inc. v. Board of Supervisors*, 72 Va. Cir. 365(Va. Cir. Ct. 2006), together with *Swiacki* and

*Ramsey*–add nothing to the analysis of this case.  The reason is very simple: these previous cases

concerned real statutes of limitation of the conventional type; however, our case involves a

bizarre contractual limitation provision, under which Mr. Yates's efforts would have been

unavailing in any event,[13] because they would have been barred as premature by AIG's unique

two-sided limitations provision.

**C.  The AIG Policy Limitations Provision Violates Public Policy, and Therefore Is Invalid.**

Now we finally come to the revelation phase of the shell game that Defendant has been

conducting so far–to examine the policy language that is the actual basis for the Defendant's

motion, and ask ourselves how, if it all, this language is supposed to work to afford a policy

owner a reasonable opportunity to vindicate her contractual rights.  The answer is that the

provision was designed by AIG *not* to work at all, but instead to place the insured into a box

from which there was no escape.  We concede that AIG's drafting was clever, but it was too

clever by half.

You can see this plainly by looking carefully at the language of Part IV, paragraph L, of

the AIG Form contract:

> "No action shall be brought against us unless the **insured person** has complied
> with this policy's provisions . . . .
>
> "You also agree to bring any action against us within one year after a loss occurs,
> but not until thirty (30) days after proof of loss has been filed and the amount of
> loss has been determined."

---

[13] The true significance of the prior state actions for this case is that AIG failed in its efforts to
raise a res judicata bar to the current action, when it appeared specially in the second Yates
action to oppose his application for a second non-suit to be taken without prejudice.  The state
court saw through that AIG's machinations, and granted Mr. Yates' motion. (*See* Tate Aff., Ex.
20).

(Tate Aff; Ex. 1 at 42, at (emphasis in the original) ).[14]  Although there are many ambiguities and imponderables created by this language (e.g., what is a "loss" occurrence, are they discrete rather than continuous, is it first, last, "rolling," or cumulative, etc.), what immediately jumps out to the reader is that this is no ordinary limitations provision–it actually is a "two-sided" limitations provision that not only bars the insured from suing after a certain time; it also bars the insured from suing *before* a certain time.  Thus, under this clause, the insured cannot sue during the retrospective period (one year in the national form, and two years under the Virginia endorsement), because AIG can stretch out its "claims processing" activities forever, by continuously asking for more detail, oral depositions, etc., just as it did in this case.  The "prematurity" bar portion is entirely within the control and manipulation of AIG, who thus can use this provision to delay indefinitely, before the insured as any ability to sue at all.  And that is exactly what happened in this case.

For this reason, all of the Defendant's backing and filling about when "loss" occurred and how may "losses" there were, and its frolics through tolling and nonsuit law is complete nonsense on the facts of this case.  Because the policy language prevents the insured from suing "until thirty (30) days after . . . the amount of loss has been determined," this places complete control over the insured's right to sue in the hands of AIG, who would be the person being sued.  In contrast, AIG has no limit to the time it could take to "determine" the loss, which means that AIG could go on forever, as it nearly did in this case, pretending to "process" or "investigate" or "determine" the loss for over four years after first notified by the insured.  Now, AIG seems to be contending that Ms. Brentzel became time-barred about halfway through that process, and *before*

---

[14] We quote here from the standard AIG form, which applies unaltered to the D.C. policies but is subject to AIG's Virginia Amendatory Endorsement that has the identical language, except that the first stated time period is two years rather than one (*see* Tate Aff, Ex. 1, at 57).

she would have been allowed to sue under the time provisions of the policy.[15]

So, AIG does pull off, through this language, the ultimate contract of adhesion: Ms. Brentzel was barred from suing after two years (one year on the D.C. policies), but she was never allowed to sue anyway, because AIG never "determined" the amount of the loss until September 2019, when it "determined" that loss to be zero by issuing its denial letter on September 13, 2019.[16] This is an unconscionable position, of "heads I win, tails you lose," and completely unworthy of this litigant and its counsel. It also violates Virginia public policy, by giving the insured party essentially no time at all to vindicate their rights in a court of law.

While one is tempted to believe that the "thirty (30) days" has some kind of meaning, it is certainly not clear on the face of the policy language. Is this supposed to mean that a previously-expired limitation period someone springs back to life after AIG "determines" what the loss is? That would be a highly unusual contractual limitations provision, the like of which we have never seen. But even if that interpretation were made, it would not save the clause from invalidity. In essence, that interpretation re-introduces an "accrual" rule to measure a time period, but remember that the period of 30 days is a continuation of the "prematurity" bar–it bars a suit until 30 days *after* AIG "determines" the loss. And remember that AIG is completely in control of how long it takes to make that "determination," so AIG may always assure itself that its claims-processing goes on long enough–with or without any point--to defeat any ordinary

---

[15] We emphasize here that despite some similarity of language, the AIG form's limitations language is *not* the same or even similar to sentence [2] of Va. Code § 38.2-314. The contractual reference to "proof of loss" and the later determination of "the amount of loss" both interdict the insured's right "to bring any action against us," meaning AIG.

[16] We have now learned from AIG's exhibits that it actually had sent a denial letter earlier, on August 22 of 2019, but that letter apparently was undeliverable. Ironically, that misadventure consumed 22 days, leaving only 8 days of the 30 provided by the "springing" version of the language, but remember that 30 days measures the "prematurity" bar only. The time that this contractual clause actually allows an insured to sue is never.

limitations period.  So, this alleged "contractual limitation" actually limits the insured's time to

no time at all, and in that sense is both illusory and unconscionable.  Construing the language in

favor of the insured does no good.  There is no alternative to simply striking down paragraph L

as invalid under Virginia law.

**D.  In the Alternative, the Defendant Should Be Estopped from Asserting a Time Bar.**

Although we cannot fathom any construction of paragraph L that could save it from both

incoherence and invalidity, there is a separate and additional ground for denying the Defendant's

motion, which is that Defendant should be estopped from raising a time bar by its behavior in

leading the Plaintiffs on, or, perhaps more accurately, "lulling" both Ms. Brentzel and her

counsel into a false sense of security, by pretending to conduct a bona fide "claims adjustment"

process when in fact AIG never intended to pay out a dime, and was just stalling for time.

This record is replete with evidence of what chicanery was afoot on the AIG side, and

most of that evidence comes from their own mouths–their own letters, their questioning style at

Ms. Brentzel's day-long deposition in February 2018, the incessant quibbling and questioning of

the insured about trivia that had nothing to do with the existence or the extent of her insurable

losses, including a theft from her D.C. home.  All of these matters are fully admissible into

evidence against the Defendant as party admissions.  We leave the further factual details to the

Complaint and the Tate Affidavit (Tate Aff. ¶F; Exs. 8-16), but it suffices to say that there is

very substantial evidence that AIG never was operating in good faith with Ms. Brentzel or her

lawyer, at least from September 2016 and for the next three years of protracted discussions, the

demanded "proof of claim" in 2017, the deposition in 2018, and the entirely slothful pace of

AIG's "claims adjustment" process, which was merely a farce.  And at no time, up and including

the denial letter of September 13, 2019, did anyone associated with AIG mention anything

related to paragraph L, though they did mention, pointedly in many cases, other provisions of that same Part IV of the AIG form policy.

Under these extreme circumstances, Virginia courts have regularly ruled that the defendant is equitably estopped (sometimes referred to as "estoppel in pais") from raising a time bar. The classic case is *American Mutual Ins. Co. v.  Hamilton*, 135 S.E. 21 (1926), but the same doctrine has been applied many times in similar circumstances, *see*, *e.g.*, *United States ex rel Humble Oil and Refining Co. v. Fidelity & Casualty Co.*, 402 F.2d 893 (4th Cir. 1968); *Barry v. Donnelly*, 781 F.2d 1040 (4th Cir. 1986); *Overstreet v. Kentucky Cent. Life Ins. Co.*, 950 F.2d 931 (4th Cir. 1991).  We recognize that the Defendant may wish to contest these facts, and this Court may find triable issues of fact.  However, this record certainly does not permit the grant of a summary judgment to this Defendant, and in this respect the case is similar to *Barry v. Donnelly*, where the Fourth Circuit found triable issues under Virginia's *American Mutual Insurance* doctrine, and therefore vacated a summary judgment entered by District Judge Bryan, and remanded the case for trial on estoppel in pais.  This Court should follow that precedent.

### E.  D.C. Law Does Not Apply to Any Limitations Issue in this Case.

The Defendant takes another frolic by interweaving citations to seven D.C. cases into its discussion (*see* Def. Mem.7), and points out that, without the Virginia Amendatory Endorsement, the AIG form limitations provision only permits one year rather than two (*id.*). We are completely puzzled by this argument.  Because the standard AIG form otherwise contains exactly the same language, the only apparent difference from the Virginia version is to place the insured into the escape-proof box between tardiness and prematurity at an earlier point in the process, but since that process can be stretched out indefinitely, it is not clear what difference this makes.  Yes, the provision is even more overbearing and unfair to the insured, but

because the provision is invalid at two years, then, a fortiori, it is invalid at one, because in reality it permits no time at all for an insured to assert her rights.

Perhaps the Defendant means to suggest that D.C. law should be applied to some aspect of the limitations questions in this case. If this is the intention, then it is simply wrong as a matter of established law.

Because this case does not involve a federal law claim, this Court is bound by *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941), to apply the choice of law rules of the state in which it sits, in this case Virginia. Under Virginia choice of law rules, limitations issues usually are classified as "procedural," and therefore the choice of law rule is *lex fori*, the law of the forum, which of course is Virginia. This Court's decision in *Alowole v. ActioNet, Inc.*, 258 F. Supp. 3d 694, 702-07 (E.D.Va. 2017) discusses this general rule in Virginia and the limited exceptions applicable to certain claims resting on the law of another state. But no such exception applies in this case. The more recent decision by the Virginia Supreme Court in *Radiance Capital Receivables v. Foster*, 833 S.E. 2d 867 (Va. 2019), makes clear that Virginia applies its own limitations law to contractual provisions concerning limitations, even those in a contract governed by the law of another state, in that case Alabama.

So, there is no room for D.C. law on the issues made by the Defendant's motion.

## II.  Defendant's Tag-Along Request for Dismissal of Count II Is Meritless.

One of the more cryptic aspects of the Defendant's already-puzzling motion papers is its tag-along request (Def. Mem. 13-15) for dismissal of Count II of the Complaint here, which is stated in the alternative to the bad faith allegations set forth also in Count I. Defense counsel must be suffering from either a lack of attention to the actual allegations of the Complaint (¶¶ 61-70), or from another mistake in applicable law. The sufficiency of a federal pleading is governed

by the Federal Rules of Civil Procedure, and not by state substantive law.  And there is a Federal

Rule directly on point, and contrary to the Defendant's argument.  This is Rule 8(d)(2), which

provides as follows:

> "A party may set out 2 or more statements of a claim or defense alternatively or
> hypothetically, either in a single count or defense or in separate ones.  If a party
> makes alternative statements, the pleading is sufficient if any one of them is
> sufficient."

Fed. R. Civ. P. 8(d)(2).  In the Complaint in this case, the plaintiffs did exactly as instructed by

Rule 8, and thus gave notice of intent to pursue a remedy for AIG's bad faith in both Count I and

Count II.  That was permissible pleading, and the Defendant has no valid ground to attack it.


## CONCLUSION

For the reasons stated above, this Court should deny the Defendant's Motion for

Summary Judgment, in its entirety.

Respectfully submitted,

_____/s/_____
James R. Tate, Esq. (Virginia State Bar No. 6241)
TATE BYWATER
2740 Chain Bridge Road
Vienna, Virginia 22181
Tel: (703) 938-5100
Fax: (703) 991-0605
jtate@tatebywater
*Counsel for Plaintiffs Cathy Marie Brentzel and Estate of
Robert C. Hacker*

## CERTIFICATE OF SERVICE

I certify that on March 4, 2021, I caused the foregoing to be served by electronic mail and first-class mail, postage prepaid, to:

> John F. O'Connor
> Steptoe & Johnson LLP
> 1330 Connecticut Ave., N.W.
> Washington, D.C. 20036
> Email: joconnor@steptoe.com

>                 /s/
>                 _____
> James R. Tate (Va. Bar. No. 6241)
> Tate Bywater
> 2740 Chain Bridge Road
> Vienna, Virginia 22181
> Phone: 703-938-5100
> Email: jtate@tatebywater.com